IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KENNETH KIELBANIA, and GAY KIELBANIA, | ) | |
| | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | |
| v. | ) | 1:11CV663 |
| | ) | |
| INDIAN HARBOR INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant/Counter-Claimant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This is an action concerning property insurance coverage of a commercial building in

Beech Mountain, North Carolina, that was damaged by fire, smoke, and water in 2010. Plaintiffs

Kenneth Kielbania and Gay Kielbania ("Plaintiffs"), the property owners, filed this suit against

Defendant Indian Harbor Insurance Company ("Indian Harbor" or "Defendant"), the insurer,

for breach of the insurance policy and unfair insurance practices in violation of North Carolina

General Statute § 75-1.1 & § 58-63-15(11)(2011).   The parties have filed cross-motions for

summary judgment.  Defendant Indian Harbor's Motion for Summary Judgment [Doc. #26]

seeks judgment dismissing all of Plaintiffs' claims, and also seeks summary judgment in its favor

on its declaratory judgment counterclaims.  Plaintiffs' Motion for Summary Judgment [Doc.

#28] seeks judgment in their favor on the claims for breach of the insurance policy and unfair

insurance practices.  For the reasons set out below, the Court concludes that Plaintiffs are not

entitled to relief on their claim for breach of the insurance policy, but that Plaintiffs have

presented sufficient evidence from which a jury could find unfair insurance practices. Therefore, the Court will recommend that Plaintiffs' Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted in part and denied in part, and that this matter proceed to trial on the claims of unfair insurance practices.

I.    FACTUAL BACKGROUND

Plaintiffs own a building in Beech Mountain, North Carolina, that had at various times housed restaurants, ski equipment and apparel stores, game rooms, and residential living space. (Pls.' Compl. [Doc. #4] ¶ 3.)  Defendant Indian Harbor issued a Policy, No. FCI 005 4702, insuring the property for the period from November 17, 2009, through November 17, 2010. (Id. ¶ 4.)  The coverage limit of the Policy was $1,755,000.  (Policy [Doc. #27-1 at 14].) Plaintiffs were the named insureds on the Policy, which protected against fire damage, among other causes of loss.  On March 6, 2010, an accidental fire damaged Plaintiffs' property. (Compl. ¶ 6.)  Immediately after the March 6 fire, Plaintiffs gave notice to Defendant of their loss.  Although there was no dispute that the Policy provided coverage for the damage to the property, the parties disagreed as to the value of the loss, and disputed some of the terms of coverage, in particular whether a "coinsurance provision" applied and whether an "inflation rider" provision should have applied.  Those provisions of the Policy are set out in greater detail in the Discussion below.

After receiving notice of the claim, Defendant retained Stephen Gwertzman of US Adjustment Corporation as the third-party administrator for the claim.  US Adjustment retained Mr. Douglas White ("Mr. White" or "Adjuster White") as the local adjuster and retained Mr.

John Grazier ("Mr. Grazier") and Grazier Construction Company ("Grazier") to conduct an appraisal. (Pls.' Br. App. 3, 4 [Doc. #29-2 at 3-4].) Mr. White visited the property within a few days after the fire, and visited the property again with Mr. Grazier on March 23. On March 29, 2010, Defendant obtained an estimate of the loss (Estimate 1) from Grazier of $1,070,131.17 for replacement cost value, and $903,913.75 for actual cash value. (Def.'s Br. Ex. 6 [Doc. #27-2 at 2].) In his deposition in this case, Mr. Grazier stated that he knew that the estimate would need to be amended because he knew "there's going to be more water damage as this water filters down through the building," although the Estimate itself did not include any indication to this effect. (Def.'s Br. Ex. 4 [Doc. #27-1 at 97].)[1] The overall value of the building (not just the loss amount) was determined by Mr. White to be $2,567,704.00 as the replacement cost. (Def.'s Br. Ex. 13 [Doc. #27-3 at 21].) On April 7, 2010, Plaintiff Kenneth Kielbania and Plaintiffs' counsel met with Adjuster White and Stephen Gwertzman of US Adjustment Corporation to tour the damaged property and review the Estimate provided by Grazier. (Def.'s Br. Ex. 13 [Doc. #27-3 at 17-19].)

Plaintiffs raised concerns regarding Estimate 1, and at the request of Mr. White, Plaintiffs provided a description of all aspects of Estimate 1 that Plaintiffs believed were either inadequate

---

[1] In his deposition, Mr. Grazier noted that at the time of his inspection on March 23, 2010, the water was ice, but that he "knew it was going to go right through because water goes downhill." Mr. Grazier stated that he "gave them a number that I thought covered all the fire and water damage related to the day I was there, with the stipulation that I thought I'd have to revisit to see when the water went through the building." (Def.'s Br. Ex. 4 [Doc. #27-1 at 66-67].) Although Mr. Grazier contends that he provided this "stipulation" to Mr. White at the time of the initial Estimate, this information was not included in the Grazier Estimate provided to Plaintiffs, and Plaintiffs contend that they were never made aware of this caveat to Estimate 1 until after this litigation commenced. In addition, there is no indication that Mr. Grazier followed through to "revisit to see when the water went through the building" or otherwise inspect further after March 23, 2010, until over four months later, after Plaintiffs obtained their own appraisal and raised specific concerns regarding the water damage in the older portion of the building, as discussed *supra*.

or incomplete. In addition, Plaintiffs retained Belfor USA to provide an estimate of damage caused by the fire. Belfor USA provided an estimate on June 8, 2010, stating that the property had incurred damage in the amount of at least $2,482,535.77 (Belfor Estimate), based on replacement cost value. (Def.'s Br. Ex. 7 [Doc. #27-2 at 10, 13].) The Belfor USA representative indicated that this estimate could be higher if additional water or smoke damage was discovered beyond what was then visible. (Id.) Plaintiffs provided the Belfor USA estimate to Defendant on June 11, 2010. Plaintiffs sent another letter on June 22, 2010 requesting a "prompt decision" about the claim. On July 1, 2010, Mr. White provided an internal report to US Adjustment, noting that the primary difference between Grazier's Estimate 1 and the Belfor Estimate was the "scope of the damage." Specifically, Grazier's Estimate 1 provided for extensive repairs in the "new addition" portion of the building where the fire occurred, but concluded that the "original building" required only cleaning and painting. In contrast, the Belfor Estimate contemplated extensive repairs in both the "new addition" due to fire damage, as well as the "original building" due to water damage caused by the amount of water used to fight the fire.

Plaintiff Kenneth Kielbania met with Adjuster White again on July 29, 2010, to tour the property and review the damage. In his report to US Adjustment regarding that meeting, Mr. White noted that "[b]ased upon the reinspection, there is considerable water damage in the back half of the building (original building) that was not present at the time of the initial scoping"

requiring them to "change the scope on the Grazier estimate." (Def.'s Br. Ex. 21 [Doc. # 27-5 at 3].)[2]  In addition, further review revealed that Grazier had missed various rooms during his appraisal, and that Grazier's Estimate 1 was "short" by at least 3,000 square feet.  However, Mr. White nevertheless confirmed that "we are working off our scope and estimate, not the Belfor estimate of $2.4 million." (Id. at 5.)[3]

On or about August 3, 2010, Defendant obtained a second estimate from Grazier (Estimate 2).  The revised estimate for the loss was $1,318,344.99 replacement cost and $1,094,242.13 actual cash value.  (Def.'s Br. Ex. 8 [Doc. #27-2 at 20].)  This estimate was again revised on August 9, 2010, reflecting a replacement cost value for the loss of $1,330,344.99, and an actual cash value of $1,103,842.13.  (Def.'s Br. Ex. 9 [Doc. #27-2 at 29].)  Plaintiffs contend that Estimate 2 failed to address many of the items that Defendant's Adjuster, Mr. White, had agreed were inadequate during the July 29, 2010 visit, and actually reduced the cost for several

---

[2] The situation was further described by Mr. White in his internal report as follows: "The insured and Belfor wanted to use their estimate as the foundation to have us point out where their estimate was incorrect. We took the reverse approach, and said we wanted to use the Grazier estimate of $1,070,131.17 as the foundation, and have Belfor, the insured and [Plaintiffs' counsel] show us where our estimate needed revisions.  The two estimates are pretty close on the new half of the building where the fire pretty much gutted the building.  The major differences are on the back half of the building (original construction) where the initial Grazier estimate was pretty much clean and paint.  The building seemed pretty dry at the time of our initial inspections, however, the present condition of the building reflects there was considerable water exposure on the back half of the building.  Reportedly, there was 350,000 gallons of water that was poured on the building, inclusive of the use of two overhead snorkels, and this probably accounts for water damage pretty much throughout the entire building.  The additional water damage on the back half of the building involves expensive paneling, carpeting, hardwood floors, sheetrock, insulation and fixtures (bars, insulation and sound baffling).  In the reinspection, Grazier and the adjuster made numerous revisions in our original scope, and the Grazier estimate will be updated." (Def.'s Br. Ex. 21 [Doc. # 27-5 at 5].)

[3] In his deposition, Mr. White noted that "[w]e weren't going to waste our time" addressing the Belfor estimate, and that "our technique" or "game plan" was to "go with Grazier" and require Plaintiffs to "show us where we were wrong" even after Plaintiffs had obtained their own estimate. (Pls.' Br. App. 27 [Doc. #29-3 at 129].)

-5-

categories from what had been set out in Estimate 1. Plaintiffs further contend that Mr. White thereafter sent correspondence to Plaintiffs stating that "[t]he insurance company is concerned about the delays we are encountering in bringing the loss to a conclusion" and noting that "[t]here is some evidence of ongoing damage to the building from weather elements" that would not be covered by the Policy. (Pls.' Br. App. 38 [Doc. #29-3 at 146].) Plaintiffs contend that this letter was an attempt to pressure them to settle the claim based on Defendant's unreasonably low estimates. In response to the letter, Plaintiffs, through counsel, sent a letter to Adjuster White on August 13, 2010, noting the multiple areas where Estimate 2 remained incomplete or inadequate, and contending that Defendant had failed to assess the loss in a timely manner. (Def.'s Br. Ex. 22 [Doc. #27-5 at 9].) Mr. White sent a copy of the letter to Mr. Grazier, and in the accompanying e-mail, Mr. White noted that he needed Mr. Grazier to address the items raised. Mr. White noted that he was "a little bewildered as to why our figures dropped in certain areas," and that some of the questions raised by Belfor "seem valid." (Pls.' Br. App. 39 [Doc. #29-3 at 147].)

On August 19, 2010, Defendant provided a third updated estimate (Estimate 3) from Grazier. The new estimate was $1,448,352.02 for replacement cost value and $1,270,927.01 for actual cash value. (Def.'s Br. Ex. 10 [Doc. #27-2 at 37].) In an internal report dated August 31, 2010, Mr. White noted that "we believe it is time to pay the undisputed [actual cash value] loss" see out in Estimate 3 and then "let the chips fall where they may." (Def.'s Br. Ex. 23 [Doc. #25-5 at 26].) However, the payment of the undisputed loss amount was not made. For their part, Plaintiffs continued to protest the Defendant's valuation. After receiving Estimate 3, Plaintiffs

provided a listing of disagreements with this revised estimate, and on October 5, 2010, seven months after the process began, Plaintiffs invoked the formal appraisal procedures in the Policy. (Def.'s Br. Ex. 25 [Doc. #27-5 at 38].) In the letter invoking the appraisal procedure, Plaintiffs stated that Defendant's estimate remained unacceptable and "woefully inadequate given the approximate $1.5 million shortfall reflected by the as yet unchallenged Belfor estimate." (Id.)

During the appraisal procedure, the parties agreed to appraisers Jay Evans of Belfor USA for Plaintiffs, John Grazier of Grazier Construction Company for Defendant, and Wes Baldwin as the umpire.[4] According to the Policy, as part of this procedure, each appraiser would "state separately the value of the property and amount of loss" and then if they failed to agree, the differences would be submitted to the umpire and "[a] decision agreed to by any two will be the appraised value of the property or amount of loss." (Policy [Doc. #27-1 at 30].) Therefore, as part of this process, each party submitted estimates of damage. This procedure included Defendant's fourth estimate by Grazier of $1,450,310.17 (Estimate 4) for actual cash value. (Pls.' Br. App. 12 [Doc. #29-3 at 1, 94].)

On February 25, 2011, Mr. Baldwin (the umpire) and Mr. Evans (Plaintiffs' appraiser) signed a final appraisal declaring that the damage amounted to $1,944,645.84 for replacement cost value for building repairs and $1,732,898.70 for actual cash value for the repairs. (Def.'s Br. Ex. 27 [Doc. #27-6 at 8].) The final appraisal also noted that the overall building value (not

---

[4] In deciding whether to agree to Mr. Baldwin as umpire, Mr. White sent an e-mail to Mr. Gwertzman of US Adjustment, stating that "I recommend that the insurer agree to Wes Baldwin as a potential umpire after we get our appraiser in place. Wes is a PA in Charlotte, NC whom I have worked with extensively for 15 years. He is not a typical PA. He is fair but not detail oriented (more of a bottom line person). I am not saying this concedingly [sic] but I know he has a lot of respect for me and will lean toward what I have to say." (Def.'s Br. Ex. 26 [Doc. #27-6 at 3].)

just the cost of repairs) was $4,600,000 for replacement value. This appraisal notes that "[t]he policy coinsurance calculation, previous payments and various deductibles will be applied to all of the awards." (Id.) Mr. Grazier did not initially sign the appraisal determination.

Over the course of the next few days, Adjuster White sent several e-mails to Mr. Baldwin (the umpire) about the appraisal, but did not initially send a copy of his e-mails to Plaintiffs or to Plaintiffs' Appraiser Mr. Evans. Adjuster White also had at least one telephone conference with Mr. Baldwin. After subsequent inquiry and discussion, Mr. Baldwin and Mr. Grazier signed an amended appraisal award stating that the overall value of the building (not just the repairs) was $3,409,691.30 in replacement value and $2,386,783.91 in actual value. (Def.'s Br. Ex. 27 [Doc. #27-6 at 9].) Mr. Grazier then signed the final appraisal.

Following the conclusion of this appraisal process, Defendant then used the $1,732,898.70 figure from the appraisal for the actual cash value of the loss, but applied a "coinsurance penalty" of $140,150.18, a $5,000 deductible, and $12,521.06 in amounts previously paid for temporary repairs, and calculated the award as $1,575,227.46. (Def.'s Br. Ex. 30-31 [Doc. #27-6 at 22-26]; Compl.¶ 17.) Defendant paid Plaintiffs the amount of $1,575,227.46 in April 2011. (Def.'s Br. [Doc. #27] at 6; Pls.' Br. App. 41 [Doc. #29-3 at 153-154].)

Plaintiffs then filed this action in state court on July 19, 2011, and Defendant removed it to this Court on August 22, 2011. Plaintiffs' First Claim for Relief is for breach of the Policy. Plaintiffs allege that Defendant breached the Policy by the application of the "coinsurance provision" of the contract and by failing to apply an "inflation guard" provision of the Policy. (Compl. ¶¶ 18-22.) As discussed in greater detail below, the "coinsurance provision" operates

as an "underinsured penalty" by limiting coverage if the insured has failed to insure the property for at least 80% of its overall value. In this case, Plaintiffs contend that the coinsurance provision would apply only if they elected to recover "replacement cost value," but should not apply here since they elected to recover "actual cash value" instead. Based on this interpretation, Plaintiffs contend that Defendant breached the Policy by deducting $140,150.48 from their award pursuant to the "coinsurance provision." With respect to the "inflation guard" rider, Plaintiffs contend that Defendant breached the Policy by failing to apply this optional coverage in calculating the award. The "inflation guard" coverage provides for automatic increases in the policy limits over time, and Plaintiffs contend that application of this provision would have resulted in an additional $40,000 to them.

Plaintiffs' Second Claim for Relief is for unfair insurance practices. Plaintiffs claim that Defendant has engaged in several unfair trade practices in violation of North Carolina General Statute § 75-1.1, including unfair insurance settlement practices set out in North Carolina General Statute § 58-63-55(11). These include not attempting to settle the claim in good faith, compelling the insured to institute litigation, and attempting to settle a claim for an unreasonable amount. (Id. ¶ 24.) Plaintiffs also claim that Defendant's conduct and misconduct in the settlement process constitute unfair and deceptive acts or practices in violation of North Carolina General Statute § 75-1.1 and § 75-16.[5] Plaintiffs' Third Claim for Relief is a similar claim for punitive damages based on Defendant's alleged bad faith refusal to settle the claim.

---

[5] All of the claims are referred to collectively herein as claims for "unfair insurance practices" for ease of reference.

Defendant answered Plaintiffs' Complaint and filed Counterclaims. In Count I, Defendant asks that the Court declare that the "inflation guard" optional coverage does not apply to Plaintiffs' claim. (Defs.' Answer [Doc. #7] ¶¶ 44-50.) In Count II, Defendant seeks a declaration that the coinsurance provisions of the Policy were properly applied, regardless of whether Plaintiffs elect to recover the "replacement cost value" or the "actual cost value" of the loss. (Id. ¶¶ 51-60.) The parties have filed cross-motions for summary judgment as to all of these claims and counterclaims.

II.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The Court of Appeals for the Fourth Circuit has noted that summary judgment is appropriate "in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211 (4th Cir. 1993).

In applying this standard with respect to the parties' present Motions for Summary Judgment, the Court will first consider the claims related to alleged breach of the Policy, and will then consider the claims for unfair insurance practices or bad faith failure to settle.

B.      Breach of Policy Claims

As noted above, Plaintiffs' First Claim in this case is for breach of contract, alleging that Defendant breached the Policy by applying a "coinsurance provision" and by failing to apply an "inflation guard" rider. Defendant filed counterclaims seeking a declaratory judgment that there was no breach of the policy in either respect. The parties have filed cross-motions for summary judgment on this issue.

In considering a claim for breach of an insurance policy, North Carolina courts recognize the "well-settled principle that an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." Fid. Bankers Life Ins. Co. v. Dortch, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986). Interpretation of an unambiguous contract is a question of law for the court, and courts must "construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used." Fid. Bankers, 318 N.C. at 380, 348 S.E.2d at 796; Barbee v. Harford Mut. Ins. Co., 330 N.C. 100, 408 S.E.2d 840 (1991). In construing an insurance policy, the "various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 506, 246 S.E.2d 773, 777

(1978). Under North Carolina law, "[d]eclaratory judgment is appropriate for the construction of insurance contracts and in determining the extent of coverage under an insurance policy." Hobson Constr. Co., v. Great Am. Ins. Co., 71 N.C. App. 586, 589, 322 S.E.2d 632, 634 (1984).

In light of these standards, the Court will consider in turn the Motions for Summary Judgment with respect to the alleged breach of the insurance Policy as to the (1) coinsurance provision; and (2) inflation rider provision.

       1.     Coinsurance Provision

Plaintiffs and Defendant both move for summary judgment on the issue of whether the coinsurance provision of the Policy applies to Plaintiffs' loss. As noted above, a coinsurance provision operates to require the insured to maintain sufficient insurance to cover a specified percentage of the overall value of the insured property. "'Coinsurance clauses in substance require the insured to maintain insurance on the property covered by the policy in a certain amount, and stipulate that upon his failure to do so, the insured shall be a coinsurer and bear his proportionate part of the loss on the deficit.' For example, '[i]nsurance policies that protect against hazards such as fire or water damage often specify that the owner of the property may not collect the full amount of insurance for a loss unless the insurance policy covers at least some specified percentage, usually about 80 percent, of the replacement cost of the property.' Coinsurance clauses are designed to induce the insured to carry full, or nearly full coverage, and are generally held enforceable unless they are specifically prohibited by statute in the jurisdiction." Surratt v. Grain Dealers Mut. Ins. Co., 74 N.C. App. 288, 292, 328 S.E.2d 16, 19

(1985) (quoting 44 Am. Jur. 2d Insurance Sec. 1510 at 505-06, and Black's Law Dictionary 236 (rev. 5th ed. 1979)).

In the present case, the parties agree that there is a "coinsurance" provision in the Policy. However, Plaintiffs contend that the coinsurance clause in the Policy applies only when the insured elects a "replacement cost" valuation. (Pls.' Br. [Doc. #29] at 12.) Plaintiffs further contend that since they selected an "actual cost" valuation, they should not be subject to the coinsurance penalty. (Id.)

The Policy at issue in this case consists of a cover page, which sets out "Common Policy Declarations," a "Declarations" page, a Schedule of Forms, a "Location Schedule," a 15-page Policy, and a page of "North Carolina Changes." (Policy [Doc. #27-1].) The cover page of the policy sets out the "Common Policy Declarations" and includes the policy period, the named insured, and a premium summary bearing the prominent notation, "COINSURANCE CONTRACT." (Id. at 11.) The following page of the Policy is labeled "Commercial Property Coverage Part Declarations." A $5,000.00 deductible is noted on this page. In addition, for several categories of information, the Declarations Page incorporates other parts of the Policy. For example, the "Description of Premises" section contains the directive to "See Location Schedule attached." (Id. at 12.) In addition, the "Coverages Provided" section directs the reader to "See Location Schedule attached." (Id.) The "Location Schedule" of the Policy contains eight columns of information, as set out below: (Id. at 14.)

| Loc. | Bldg. | Location Address | Coverage | Values | Covered Cause of Loss | Co-Ins. | Valuation |
|------|-------|------------------|----------|--------|----------------------|---------|-----------|
| 1 | 1 | 704 Beech Mtn Pkwy | REAL PROPERTY | $1,755,000 | Special-Excluding Flood & Quake | 80% | RC |

-13-

The Policy itself states that, "[i]f a Coinsurance percentage is shown in the Declarations, the following condition applies[:] We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property. Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;
(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);
(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and
(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) of the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself." (Policy [Doc. #27-1 at 26].) Thus, if the Limit of Insurance (in this case, $1,755,000) is a specified percentage (here, 80%) or more of the "value of Covered Property," no penalty applies. In determining the "value of Covered Property," the Policy provides the following Valuation Loss Condition: "[w]e will determine the value of Covered Property in the event of loss or damage as follows: At actual cash value as of the time of loss or damage," subject to exceptions for certain items such as "stock" or glass. (Policy [Doc. #27-1 at 25].) Under the Policy provisions, the insurer can elect to pay the value of lost or damaged property, pay the cost of repairing the lost or damaged property, take the property at an agreed or appraised value, or repair, rebuild, or replace the property. (Policy [Doc. #27-1 at 24].)

The Policy also includes several "optional coverages" that apply "[i]f shown as applicable in the Declarations." (Policy [Doc. #27-1 at 28].) These optional coverages include "Inflation

-14-

Guard" and "Replacement Cost."  If "Replacement Cost" coverage is included, the Policy provides that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form." (Id.)  Under this provision, an insured may recover the replacement cost for lost or damaged property, without depreciation, but only if the lost or damaged property is actually repaired or replaced as soon as reasonably possible after the loss or damage.  However, this provision also allows the insured the option to elect to recover "on an actual cash value basis instead of on a replacement cost basis." (Id.)

In this case, there is no dispute that a coinsurance notation of 80% appears on the Location Schedule page of the Policy, which is incorporated into the Declarations.  There is also no dispute that the optional coverage for "Replacement Cost" applies, based on the designation "RC" in the "Valuation" column on the Location Schedule.  However, Plaintiffs contend that because the 80% coinsurance notation appears in a column adjacent to the "RC" replacement cost notation, the coinsurance provision applies only if replacement cost is elected. (Id.)  Thus, Plaintiffs contends that if they elect "actual cash value," no coinsurance provision applies at all. In contrast, Defendant contends that if Plaintiffs elect "actual cash value," then "replacement cost" does not replace "actual cash value," and coinsurance is calculated based on 80% of actual cash value.[6]

---

[6] Under the terms of the Policy, if Replacement Cost coverage applies, "replacement cost" replaces "actual cash value" in the Valuation Loss Condition.  However, Defendant does not contend that the Replacement Cost coverage should be read to impose a coinsurance requirement of 80% of replacement cost even if actual cash value is selected as the basis for a claim.  Such a reading, not advanced here, would have penalized Plaintiffs for failing to maintain insurance at 80% of Replacement Cost Value, and would have reduced Plaintiffs' recovery by over $1 million, based on a $3,409,691.30 Replacement Cost Value and 80% coinsurance provision.  Instead, when Plaintiffs elected actual cash value as the basis for their claim, Defendant conceded that the default provisions set out above provided for a coinsurance requirement of 80% of actual cash value, not 80% of replacement cost value.

-15-

In considering Plaintiffs' contentions, the Court concludes first that the columns on the Declarations page simply reflect the relevant elections as to two separate policy provisions: coinsurance and optional replacement cost. Thus, the "RC" notation on the Location Schedule is the means for noting that optional replacement coverage is included. Likewise, the "80%" on the Location Schedule is the means for noting the coinsurance percentage that applies. These are listed in separate columns on the Schedule to convey the elections that will apply with respect to each of these separate Policy provisions. There is nothing in the Declarations to connect the coinsurance percentage to only replacement cost valuation, and the proximity of the columns in these circumstances could not be reasonably read to mean that the coinsurance provision applies only if replacement cost is elected. See Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc., 706 N.W.2d 426 (Mich. Ct. App. 2005) (rejecting the contention that the proximity of a coinsurance percentage to a valuation method in separate columns on the Declarations page of an insurance policy limited the coinsurance provision to that valuation method).

Moreover, Plaintiffs point to no other language in the Policy which suggests that the coinsurance percentage applies only to replacement cost valuations. Instead, several features of the Policy suggest that the coinsurance provision applies to either method of valuation. First, in very conspicuous lettering on the first page of the contract, the words "COINSURANCE CONTRACT" appear. There is no indication here that the coinsurance provision applies only for replacement cost valuations. In addition, as discussed above, the coinsurance provision itself provides a limit that is tied to the "value of Covered Property," which under the terms of the

Policy is defined by default as "actual cash value." See State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C., 572 F.3d 511 (8th Cir. 2009) (interpreting similar policy provisions); Wenrich v. Employers Mut. Ins. Cos., 132 P.3d 970, 975-76 (Kan. Ct. App. 2006) (same, and noting that "[i]f the optional [replacement cost] coverage had not been declared, the coinsurance provision would be interpreted consistent with the valuation provision to require use of 'actual cash value'"); Wetmore v. Unigard Ins. Co., 107 P.3d 128, 128-29 (Wash. Ct. App. 2005) (same, and noting that "an insured's exercise of the right to elect the type of claim made [either replacement cost or actual cost] affects the pertinent value" of the property for purposes of applying a coinsurance provision).

In an effort to show that the Policy is at least ambiguous as to whether the coinsurance provision applies to claims made on an actual cash value basis, Plaintiffs point to statements made by Defendant's adjuster, Mr. White, during his deposition, to the effect that he was not sure at a certain point in time whether the coinsurance penalty would apply to an actual cash value basis of valuation. (Pls'. Br. App. 58 [Doc. #29-3 at 177].) However, a close examination of this exchange during Mr. White's deposition reveals that the basis of his uncertainty was that he did not know the value of the property that the appraisers would agree upon. As seen from the above discussion of the calculation of the coinsurance penalty, whether the penalty applies depends on the value of the property. Therefore, without this figure, there was bound to be uncertainty as to whether the coinsurance penalty applied. This context is confirmed by Mr. White's answer to the next question in his deposition, because when asked why he had doubt about whether the coinsurance penalty would apply to a valuation on an actual cash value basis,

-17-

Mr. White said, "What – because it was out of my hands; whatever the appraisers come up with, that's what was going to prevail." (Pls'. Br. App. 58 [Doc. #29-3 at 177].) In addition, the Court notes that this understanding is further supported by a notation in Mr. White's internal report dated April 14, 2010. (Def.'s Br. Ex. 13 [Doc. #27-3 at 21].) In that report, Mr. White noted that the replacement cost value of the building was estimated to be $2,567,704 and that "[e]ighty percent of $2,567,704.00 is $2,054,173.00. Thus, the insured is not in compliance with the 80% coinsurance clause requirement, and the penalty would be 14.56% on any replacement cost loss. The insured is in compliance with the 80% coinsurance clause based upon ACV values." (Id.) This notation supports the conclusion that Mr. White understood from the beginning that the 80% coinsurance provision would apply to both replacement cost and actual cost valuation, and did not think that the coinsurance provision would apply to actual cost based on the valuation at that time. Thus, the only uncertainty was whether the actual cost valuation would be sufficiently high to trigger the coinsurance provision. Therefore, Plaintiffs' argument on this point should be rejected.

Finally, the Court notes that Plaintiffs rely on Surratt, 74 N.C. App. 288, 328 S.E.2d 16. In that case, the North Carolina Court of Appeals found that a coinsurance provision was unenforceable because the face of the policy did not include the required "coinsurance contract" designation. 74 N.C. App. at 293, 328 S.E.2d at 19. As part of that determination, the court also construed certain policy language that contained a coinsurance provision within a replacement cost provision. The court noted that the replacement cost provisions were not relevant to the determination of the actual cash value basis of recovery. However, that decision involved an

-18-

interpretation of different policy terms, and does not provide any further guidance regarding the interpretation of the Policy provisions in the present case.

For all of the foregoing reasons, the Court concludes that the Policy in this case could not be reasonably read to impose a coinsurance provision only if replacement cost valuation is elected, and instead the Policy as written must be read to impose a coinsurance obligation regardless of which valuation is elected. The coinsurance provision was therefore properly applied in the present case. Therefore, this Court will recommend that Plaintiffs's Motion for Summary Judgment on this issue be denied, and that Defendant's Motion for Summary Judgment on this issue be granted.

2.      Inflation Guard Coverage

Plaintiffs do not seek summary judgment on their claim that Defendant breached the Policy by not applying "inflation guard" coverage to their claim. (Pls.' Mot. [Doc. #28].) However, Defendant seeks summary judgment dismissing this claim and for a declaratory judgment that no such coverage exists. (Def.'s Mot. [Doc. #26].) Defendant contends that Plaintiffs had no contract for the inflation guard coverage because it was not included in the Policy. (Def.'s Br. [Doc. #27] at 6-7.) Plaintiffs failed to respond to Defendant's argument in their Response. (Pls.' Br. [Doc. #31].)

As noted above, "Inflation Guard" is a type of optional coverage in the Policy. (Policy [Doc. #27-1 at 28].) It applies "[i]f shown as applicable in the Declarations." (Id.) If "Inflation Guard" is included as optional coverage, the Limit of Insurance will increase based on the number of days the policy has been in effect (as a proportion of a year), multiplied by a

-19-

percentage shown in the Declarations page. (Id.) However, Plaintiffs fail to point to any language in the Declarations section of the Policy, or any other section, electing this coverage or applying this optional coverage to their loss. The "Optional Coverages" section of the Declarations Page does not list any optional coverage for Plaintiffs, and no percentage for an Inflation Guard rider is reflected on the Declarations page. (Id.) Accordingly, the Court finds that Inflation Guard optional coverage was not elected and does not apply. There is no genuine issue of fact on this claim, and Defendant is entitled to judgment as a matter of law on this issue.

Therefore, with respect to Claim I for breach of contract and Defendant's counterclaims for declaratory judgment on the breach of contract issues, the Court will recommend that Plaintiffs's Motion for Summary Judgment be denied and that Defendant's Motion for Summary Judgment be granted.

C.      Unfair Insurance Practices and Bad Faith Failure to Settle

In addition to the breach of contract claims, Plaintiffs also bring claims alleging that Defendant engaged in unfair trade practices and unfair insurance settlement practices under North Carolina law. In order to establish an unfair or deceptive trade practice in violation of Section 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) which proximately caused injury to plaintiffs. Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Id.

When an insurance company engages in conduct manifesting an inequitable assertion of power or position, including conduct which may be described as unethical, that constitutes an unfair trade practice. Johnson v. First Union Corp., 128 N.C. App. 450, 458, 496 S.E.2d 1, 6 (1998). In addition, "Section 58-63-15 of the North Carolina General Statutes defines unfair methods of competition and unfair or deceptive acts or practices in the insurance industry. Enumerated within this section is a list of unfair claim settlement practices. The North Carolina Supreme Court has held that when an insurer engages in any practice or act specifically prohibited under Section 58–63–15(11), it 'also engages in conduct that embodies the broader standards of N.C.G.S. § 75–1.1 because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers.' Accordingly, a violation of Section 58–63–15(11) constitutes an unfair and deceptive trade practice in violation of N.C. Gen. Stat. § 75–1.1 as a matter of law." Central Carolina Bank and Trust Co. v. Security Life of Denver Ins. Co., 247 F. Supp. 2d 791, 800 (M.D.N.C. 2003) (quoting Gray, 352 N.C. at 68-71, 529 S.E.2d at 681-83).

In the present case, Plaintiffs point to four alleged "unfair claim settlement practices." (Pls.' Br. [Doc. #29], at 14.) These four practices are: (1) "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"; (2) "Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured"; (3) "Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled"; and (4) "Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or

-21-

applicable law for denial of a claim or for the offer of a compromise settlement." N.C. Gen. Stat. § 58-63-15(11)(f), (g), (h), & (n).

Having considered the evidence presented with respect to this claim, the Court concludes that neither party is entitled to summary judgment on Plaintiffs' Second Claim for Relief alleging unfair insurance settlement practices. First, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find that Defendant violated Section 75-1.1, including by acting in a manner proscribed by Section 58-63-15. In this regard, there is evidence from which a jury could conclude that Defendant's appraiser failed to adequately inspect the property, which resulted in him missing several rooms and being "short" by 3,000 square feet, and failed to adequately investigate potential water damage; that Defendant knew that the initial estimate did not include all of the expected water damage, but this information was not disclosed to Plaintiffs, and the estimate was instead presented to Plaintiffs as the total valuation; that Defendant failed to consider Plaintiffs' counter-appraisal and instead insisted on using its estimate as the basis for negotiations (as its "game plan"), even after Defendant knew that the initial estimate was inaccurate and that the "scope of the damage" was substantially greater than what was included in the initial estimate; that Defendant revised its estimates multiple times with increases in relatively small increments, but failed to include items it had agreed to include and then actually reduced its estimates in many areas without providing a sufficient explanation for the changes, leaving Defendant's own adjuster "bewildered"; that Defendant's initial offer and estimate of the loss at $903,913.75 actual cash value was unreasonable in the circumstances, and was roughly half the umpire's ultimate appraisal of

-22-

$1,732,898.70 actual cash value, a difference of over $800,000.00; that the process stretched over many months and resulted in significant delays that could be viewed as an effort to "wear down" Plaintiffs and then pressure them to take an unreasonable award; and that after the formal appraisal process was invoked, Defendant's adjuster recommended an umpire because he believed the umpire would "lean toward" him, and then attempted to engage in *ex parte* communications with the umpire.[7]

However, viewing the evidence in the light most favorable to Defendant, the Court concludes that a reasonable jury could find that Defendant acted in good faith to attempt to value the loss and settle the claim, that Defendant's estimates provided an adequate explanation and basis for the valuation, that delays in the process were primarily the result of scheduling conflicts on both sides, and that any *ex parte* contact by Defendant's adjuster with the umpire was unintentional and did not cause any harm because Plaintiffs were included in the process at all stages.

In these circumstances, and in light of the multiple factual issues that have been raised, the Court finds that it is properly the role of the jury to determine whether Defendant failed to attempt in good faith to effectuate prompt and fair settlement, whether Defendant's offers to settle were less than an amount to which a reasonable man would have believed he was entitled, whether Defendant promptly provided a reasonable explanation of the basis for its offers, and

---

[7] To the extent that this *ex parte* contact involved the coinsurance provision, the Court notes that the coinsurance provision was properly applied, and the appraisal board was empowered to determine the value of the property and the amount of loss. (Def.'s Br. Ex. 25 [Doc. #27-5 at 40]; Policy [Doc. #27-1 at 30].) However, this *ex parte* contact may nevertheless be indicative of efforts to improperly influence the appraisal process.

whether Defendant compelled Plaintiffs to institute litigation by offering substantially less than the amounts ultimately recovered. See N.C. Gen. Stat. § 58-63-15(11)(f), (g), (h), & (n). Therefore, the Court will recommend that the Motions for Summary Judgment be denied as to this claim.

Finally, the Court notes that in addition to the claims for unfair insurance practices, Plaintiffs also assert a claim for punitive damages for bad faith refusal to settle. (Compl. ¶¶ 27-28.) Plaintiffs contend that Defendant's conduct constitutes a bad faith refusal to settle and that they have been injured as a result. Defendant moves for summary judgment on this claim. "In order to recover punitive damages for the tort of an insurance company's bad faith refusal to settle, the plaintiff must prove (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct." Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416, 420, 424 S.E.2d 181, 184 (1993); see also Blis Day Spa, LLC v. The Hartford Ins. Grp., 427 F. Supp. 2d 621, 636 (W.D.N.C. 2006); Robinson v. North Carolina Farm Bureau Ins. Co., 86 N.C. App. 44, 49-50, 356 S.E.2d 392, 395 (1987) ("We find nothing in the case law which requires that the tortious conduct be accompanied by a breach of the contract, even though most, if not all, of the cases have as a factual background the insurance company's refusal to pay. We do not believe an action for punitive damages from tortious conduct is precluded when the company eventually pays, if bad faith delay and aggravating conduct is present."). In this context, "bad faith means 'not based on honest disagreement or innocent mistake.'" Lovell, 108 N.C. App. at 421, 424 S.E.2d at 184 (noting that the evidence was sufficient to support a finding of bad faith refusal to settle where the evidence could support a finding "that defendant

intended to 'wear down' the [plaintiffs] to influence settlement of the liability claim"). In addition, North Carolina courts have held that requiring plaintiff to "go to the inconvenience and expense of obtaining qualified, expert estimates" is indicative of aggravated conduct  See Dailey v. Integon Gen. Ins. Co., 75 N.C. App. 387, 397, 331 S.E.2d 148, 155 (1985).  A low settlement offer in violation of N.C. General Statute § 58-63-15(11)(h) is also a factor contributing to aggravated conduct.  See Smith v. Nationwide Mut. Fire Ins. Co., 96 N.C. App. 215, 218, 385 S.E.2d 152, 154 (1989) ("Additional facts which support this claim include the 5-month passage of time between when the adjuster from defendant company first observed the damages to plaintiff's mobile home and when a claim check was issued; the extended period of negotiations with little progress toward reaching a resolution; and the substantial disparity between both of plaintiff's estimates and the estimate relied upon by defendant.").  "[T]he awarding of punitive damages and the amount to be allowed, if any, rest in the sound discretion of the jury."  Worthy v. Knight, 210 N.C. 498, 498, 187 S.E. 771, 772 (1936).  Here, Plaintiffs have sufficient evidence to warrant the jury's consideration of Plaintiffs' unfair insurance practice claims, as discussed above.  For the same reasons, summary judgment would not be appropriate as to this similar claim for bad faith failure to settle, and any ultimate election of remedies would be matters for trial.  Therefore, the Court will recommend that Defendant's Motion for Summary Judgment on this claim be denied.

## III.  CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment [Doc. #26] be granted as to Plaintiffs' First Claim for Relief, but otherwise

be denied, that Plaintiffs' Motion for Summary Judgment [Doc. #28] be DENIED, and that this matter proceed to trial on Counts II and III related to Plaintiffs' claims for unfair insurance practices and bad faith failure to settle.

This, the 10th day of September, 2012.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge
